SAN ANTONIO & ARANSAS PASS RAILWAY COMPANY v. L. C. BEAUCHAMP.

Decided February 23, 1909.

**1.—Negligence—Handhold on Car—Charge.**

Where the railway company was charged with negligence in allowing a handhold on a car to remain in an unsafe and defective condition, causing it to give way when used by an employe, and there was evidence tending to show that it gave way because of defects other than the insufficient length of the screws which fastened it, which might have been discovered by the exercise of proper care and which, combined with the insufficient length of the screws, contributed to the instability of the fastening, a requested charge to return a verdict for defendant if the jury believed that the handhold was originally fastened by screws of insufficient length, and that the cause of the handhold giving way was the insufficient length of the screws and this condition could not have been discovered by the exercise of ordinary care in inspecting same, was properly refused.

**2.—Charge—Special Charges.**

Special charges are properly refused when they are sufficiently embraced in and covered by the general charge.

**3.—Pleading—Defective Appliances—Railways.**

A plaintiff is not ordinarily presumed to know the condition of the track, machinery and equipages of a railroad so as to specify what particular defect brought about the disaster by which he was injured; and if the allegation points out the particular place and thing which were insufficient and needed repair, it is not necessary to detail their faults and imperfections.

**4.—Same—Defective Handhold.**

An allegation that the handhold gave way because of its unsafe and defective condition, was not subject to special exception on the ground that it was too general and did not point out the particulars in which or in what respect it was in an unsafe and defective condition.

**5.—Same—Negligence.**

An allegation that the defective condition of the handhold was the result of the defendant's negligence and carelessness, was not subject to special exception on the ground that it was too general to apprise defendant how or in what respect it was claimed that the condition was the result of its negligence.

**6.—Personal Injuries—Damages—Pleading.**

In suits for personal injuries the rule is that, in legal contemplation, all damages which will be sustained as the effect of the injury are sustained immediately; the future effect of the injury is not special damages which

must be alleged, but general damages which necessarily flow from the injuries received.

### 7.—Pleading—Damages.

The general allegation of damages will suffice to let in proof and to warrant recovery of all such damages as naturally and necessarily result from the wrongful act complained of; the law implies such damages.

### 8.—Same—Damages—Future Suffering.

Under allegations showing that the plaintiff was seriously crippled in a manner affecting his future comfort and capacity, the law, even in the absence of an allegation as to mental and physical pain, would infer that he has suffered damages in those respects, and proof was admissible to show the character, extent and probable duration of such suffering without specific allegation thereof.

### 9.—Same—Future Suffering—Evidence.

An allegation that in consequence of plaintiff's injury his hand has been practically destroyed and that he has thereby been caused to suffer great mental and physical pain, did not restrict the right to recover to such suffering only as occurred prior to the filing of the suit; and testimony as to the condition of the hand at the time of trial and the pain then suffered, was admissible over objection that it was in the nature of future pain and there was no allegation of that kind.

### 10.—Same—Case Distinguished.

Lodwick Lumber Company v. Taylor, 39 Texas Civ. App., 302.

### 11.—Evidence—Expert Testimony—Conclusion.

Testimony of an expert car inspector, on cross-examination, that if a lag screw is loose in the wood to a point where the handhold will pull off in the ordinary use of it, a close inspection would disclose such condition, was admissible over objection that it was the conclusion of the witness and an invasion of the province of the jury.

### 12.—Same—Inspection—Conclusion.

Where an expert was asked to tell the proper method of inspecting handholds based on his experience, and his reply was that the only way he ever found to inspect handholds to know whether they were securely fastened was to climb the ladder and shake them, the testimony was admissible over objection to the question on the ground that it called for the conclusion of a witness about a matter not the subject of expert testimony.

### 13.—Verdict—Damages for Personal Injuries.

A verdict awarding damages for personal injuries in the sum of twelve thousand dollars held not so large as to warrant the conclusion that the jury were actuated by prejudice, passion or other improper motives.

### 14.—Trial—Argument—Remarks of Counsel.

Remarks of counsel for plaintiff held not ground for new trial, in view of the fact that the court twice admonished the jury not to consider them, and the further fact that counsel making them explained to the jury that he did not intend the remarks to be taken seriously and requested the jury not to consider them, and the court to so instruct.

Appeal from the District Court of Harris County. Tried below before Hon. Norman G. Kittrell.

*Baker, Botts, Parker & Garwood* and *Jesse Andrews,* for appellant. —The defendant in this case confidently believed that it ought not to be held liable for the damages that the plaintiff had sustained. It was true, as the defendant admitted in its answer, that the plaintiff

had fallen from a car in one of its trains, and had sustained injuries to his right hand, necessitating the amputation of two of his fingers, and it was true furthermore that he was caused to fall by a defective handhold. The defense was that the cause of this accident was the insufficient length of the lag screw; that this was hidden in the wood, and that the exercise of ordinary care in an inspection of the car would fail to detect this. The language of the charge is a correct statement of an abstract rule, but can not by any manner or means be said to take the place of the charge to which the defendant was entitled. The defendant requested a proper charge on this, as follows: "But if you believe from the evidence that said handhold was fastened to said car originally by lag screws of insufficient length, and that the cause of said handhold giving way was because of the length of said screw by which it was fastened, and that the condition of the handhold could not have been discovered by the defendant by ordinary care in inspecting the same, you will return your verdict for the defendant."

The court in its charge having failed to present to the jury for their consideration the facts alleged by the defendant, and supported by proof upon which it relied for a verdict, it was error to refuse the above charge which supplies this omission. Railway Co. v. McGlamory, 89 Texas, 635; Railway Co. v. Rogers, 91 Texas, 52.

The allegations in the plaintiff's petition were so general in their nature that the special exception urged by the defendant to it on this ground should have been sustained, and it was error to refuse to do so. The exception was as follows: "The defendant specially excepts to that part of the plaintiff's petition in which it is alleged 'that the said handhold gave way because of its unsafe and defective condition,' because said allegation is too general in its nature and does not point out with sufficient definiteness the particular or particulars in which said handhold was in an unsafe or defective condition, or how, or in what respect said handhold was in an unsafe or defective condition." A. J. Anderson Electric Company v. Cleburne Water, Ice & Lighting Company, 27 S. W., 504.

The court erred in allowing the plaintiff to testify as to pains suffered by him between the date of the accident and the date of the trial, as there was no pleading that admits such testimony as shown by the defendant's bill of exception. A petition speaks as of the date of the filing of the suit and, unless otherwise shown on its face, precludes inquiry into facts transpiring subsequent to that date; and there being no allegation of any pain suffered by plaintiff since then, the objection made should have been sustained. Mexia v. Lewis (Texas Sup.), 22 S. W., 397; Styles v. Fuller, 101 N. Y., 623; 21 Enc. of Pleading and Practice, p. 9.

The court erred in allowing plaintiff to testify that he did (would) continue to suffer pain in the future, and in refusing to sustain the motion of the defendant to strike such testimony as this and the testimony as to the circulation out of the record. The pleading of the plaintiff did not authorize the admission of evidence, over the objection of the defendant, of future physical pain. Railway Co. v. Curry, 64 Texas, 87; Waters-Pierce Oil Co. v. Snell, 106 S. W., 170;

Texas & P. Ry. Co. v. Goldman, 51 S. W., 275; Railway Co. v. Garrett, 99 S. W., 162; Lodwick Lumber Co. v. Taylor, 87 S. W., 358; City of Rockwall v. Heath, 90 S. W., 514; Arnold v. City of Maryville, 85 S. W., 108; Southern Pac. Co. v. Martin, 83 S. W., 676.

Whenever the rule which requires argument to be confined to the evidence and argument of opposing counsel is violated, whether it be done intentionally, recklessly or wilfully, there is a violation of the right of the opposing party to have the argument so confined, and a new trial should be granted unless it appears that the verdict was not influenced by the improper argument. The defendant's bill of exception was as follows: "Be it remembered that, on the trial of the above styled and numbered cause, Mr. John W. Parker, of counsel for the plaintiff, having stated in the opening argument in the case that a verdict for $15,000 would not, in his opinion, be excessive, Mr. Andrews, in replying to this argument, stated to the jury that $15,000 put out at interest at eight percent per annum would yield a return of $1,200 per annum, or $100 per month. He stated further, that this was more than the evidence showed that the plaintiff was earning, and argued that such an amount would be clearly excessive.

"Mr. John Lovejoy, in closing the argument in the cause, referred to the illustration that had been made by Mr. Andrews, as to the return on a recovery of $15,000 put out at eight percent interest, and in reply to the argument of counsel for the defendant that the illustration showed that such an amount would be excessive, remarked that money could not be put out at eight percent interest; that the plaintiff would have his expense to pay out of the recovery, and asked the question in his argument, where the pay for the plaintiff's attorneys would come from, and asked the further question in his argument to the jury if the defendant's attorneys thought the plaintiff's attorneys were working for nothing, or words to that effect."

*Lovejoy & Parker,* for appellee.

McMEANS, ASSOCIATE JUSTICE.—Appellee Beauchamp sued the appellant railway company for damages for personal injuries sustained by him while in the employment of appellant as brakeman on its freight train. He alleged in his petition that while serving as such brakeman it became his duty to descend the ladder on a car, and that while doing so a handhold gave way and caused him to fall upon the track and to have his right hand run over by the wheels of the car and injured so that the two middle fingers and a portion of the hand had to be amputated, and the other fingers were greatly injured and deformed; that said handhold gave way because of its unsafe and defective condition, which condition was the result of defendant's negligence and carelessness; that had defendant used ordinary care it could and would have discovered such unsafe and defective condition and have remedied the same, etc.

Defendant answered denying the allegations of the petition except such as were admitted by the answer; admitted that plaintiff was

injured by the giving way of a handhold, but denied that the giving way of the handhold was the result of its negligence or the negligence of its employes. It alleged that the car on which was the handhold which gave way was car No. 1061, belonging to the Street's Western Stable Car Line, a corporation having its principal office in Chicago; that said car was delivered to defendant by the Texas & New Orleans Railroad Company on August 14, 1906, at which time it was loaded with freight destined to a point on defendant's line, and that it was the duty of defendant to accept said car in its loaded condition and transport it to the place to which the load was consigned, and that it was under these circumstances that said car was on its line and in its train at the time the accident to plaintiff happened. That before the train in which the car was left Houston, on the morning of August 29, said car was inspected, and that so far as could be determined by any inspection that could be made, it was in a safe and sound condition; that said handhold gave way because of a defect in the original construction of said car which was not known to defendant at the time said car was placed in its train and which could not be known by it by inspecting the car; that the defect consisted in the fact that the lag screws by which the handhold was fastened to the car were not of sufficient length, and they should have been longer; that said lag screws at the time the car was inspected were buried in the wood and it was impossible for defendant to know what their length was; that defendant believed and had the right to believe that said lag screws were longer and of proper length, and that said handholds were in the condition they appeared to be, that is, in a safe and sound condition; that the handhold gave way, not because of any negligence on the part of defendant or of its employes, but on account of the manner in which the car was constructed, that is to say, on account of a latent or hidden defect in the car, as to which the defendant had no knowledge before the accident.

The case was tried before a jury and, on a verdict in favor of plaintiff, judgment was rendered in his favor for $12,000, and from this judgment defendant has appealed.

Appellant's first assignment of error is as follows: "The court erred in refusing to give defendant's requested charge No. 8, which is as follows: If you believe from the evidence that the plaintiff was, on the 29th day of August, 1906, in the employment of the defendant as a brakeman, and that on that day, in the discharge of his duty required of him as a brakeman, attempted to descend from a boxcar, the same being a part of the train operated by the defendant over its road; that while he was so attempting to alight from said car, one of the handholds attached to the end of said car to which plaintiff was holding, gave way and caused him to fall to the ground and that he was thereby injured; and if you further believe that the cause of said handhold giving away was because it was not in a reasonably safe condition on account of it being improperly fastened to the said car, and if you believe that the defendant had failed to use the care that a person of ordinary prudence would have used under the circumstances in inspecting said car to ascertain the

condition of said handhold, and that but for said want of care on the part of the defendant the accident could not have occurred, then you should find for the plaintiff; but if you believe from the evidence that said handhold was fastened to said car originally by a lag screw of insufficient length, and that the cause of said handhold giving way on account of the length of the screw by which it was fastened, and that the condition of the handhold could not have been discovered by the defendant by the exercise of ordinary care in inspecting the same, you will return your verdict for the defendant."

Whether the refusal to grant the special charge was error depends on whether the insufficient length of the lag screws was the sole cause of the handhold giving way. Manifestly, an inspection conducted with ordinary care would not have disclosed the length of the lag screws buried in the wood as they were. If, however, there was evidence tending to prove that the handhold gave way because of other defects than the insufficient length of the lag screws and which might have been discovered by an inspection conducted with ordinary care, then the requested instructions so limiting plaintiff's right to recover would be misleading. The testimony discloses that handholds are fastened by means of bolts and lag screws, and that while bolts are generally regarded as safer, it is by no means unusual to fasten them with lag screws. All the witnesses who testified on the subject agree that the lag screws in general use are one-half inch in diameter and from one and three-quarters to two and one-half inches in length. There is no testimony in the record that a handhold fastened with lag screws of the length of one and three-fourths inches is not properly and securely fastened. The only testimony that tended in any way to prove this is not true was the fact that a rule of the Master Car Builders' Association recommends that where lag screws are used they be at least two and one-half inches in length; and the testimony of appellant's foreman of the car department at Yoakum, that after seeing the lag screws with which the handhold that gave way was fastened, and which were one and three-fourths inches long, he had all the other screws removed and the handholds fastened with bolts. One of the defendant's witnesses testified that when lag screws are screwed in sound wood they make a handhold stay for a considerable time; that if one of them pulls out and the screw does not break it might be due to decay in the wood. "Mostly in such cases it is on account of the decay of the wood for a lag screw to come loose in that way." In ordinary cases lag screws get loose gradually; when they commence to get loose and continue to loosen "you can discover it by looking for it if you look close enough to see it, but you can not always tell unless you take hold of the handhold and work it." It was undisputed that the car in question was an old one and had been in use many years; that the lowest handhold was loose and could be moved with the fingers. The witness who, at Yoakum, bored holes for the bolts which were to take the place of the screws, testified that the wood was sound; that rust was in the hole out of which the screw came and there was left in the hole little particles of wood and rust off of the screw; that he did not know whether the wood was rotten around the edges of the hole;

he did not notice it; the rust was all around the edge; it had eaten its way in there to some extent. The inspectors of appellant, who inspected the car in question, had no recollection of making the inspection, but testified from the records they kept that they did inspect it on the 14th and one of them again on the 28th, and that their records disclosed that they discovered no defects in the fastenings. That the usual way of inspecting handholds was by looking at them. One of them said: "The inspector generally looks up and sees and notices the ladder irons, and if he don't notice anything suspicious . . . but everything looks good, he naturally thinks it all right, that the ladder irons are good and securely fastened and in proper place, and if anything looks suspicious to attract my attention I generally go up and investigate and pull upon them. As I pass along the side of the car I can see the ladder irons. . . . I use my sight alone in making the inspection until I see something I think is out of order." He further testified that if one knew that something was the matter with the handhold he could investigate and find it by pulling it out, "but looking up, as I stated, you would not discover it." The other inspector testified to the same manner of making inspections and further, "If I had put my finger on it (bottom handhold) and worked it and found it loose I would have set it (the car) back on the transfer. If I had found one of those screws loose I would have looked to see that the others were all right." Another witness, who had had about twelve years' experience as an inspector, testified: "The only way I ever found to inspect handholds properly to know whether they were securely fastened was to climb the ladder. I mean, to go up on the car, the same way as a brakeman, to examine and shake them. I mean, to catch hold of them, every one of them, and shake them, and if it is in any way shaky it is supposed to be fastened and tightened."

We have set out, we think, enough of the testimony to disclose that the jury under the evidence might have properly concluded that the handhold gave way because of defects other than the insufficient length of the screws, and which defects might have been discovered by the exercise of proper care, and which defects, combined with the insufficient length, contributed to the instability of the fastening. To have given the charge requested would have therefore been misleading, and it was not error to refuse to give it. (Paris & G. N. Ry. v. Calvin, 101 Texas, 291; Texas & N. O. Ry. v. Powell, 51 Texas Civ. App., 409; Texas & N. O. Ry. v. Kelly, 98 Texas, 136.) The assignment is overruled.

Special charges Nos. 5, 12 and 14 requested by the defendant, the refusal of the court to give which is made the basis of appellant's second, third and fourth assignments of error, were sufficiently embraced in and covered by the court's general charge, and there was therefore no error in refusing to give them to the jury.

Plaintiff alleged that the handhold gave way because of its unsafe and defective condition, but did not undertake to further allege in what the defect, which rendered it unsafe, consisted. Defendant specially excepted to this part of the petition, the exception being

that the allegation is too general in its nature and does not point out with sufficient definiteness the particular or particulars in which, or how, or in what respect, said handhold was in an unsafe and defective condition. The exception was overruled by the court, and in this we think there was no error. As said in East Line & R. R. Ry. v. Brinker, 68 Texas, 502, "The allegations pointed out the particular place and thing which were insufficient and needed repair, and it was not necessary to detail their faults and imperfections. A plaintiff is not ordinarily presumed to know the condition of the track, machinery and equipages of a railroad, so as to specify what particular defect has brought about the disaster by which he was injured." (Galveston, H. & S. A. Ry. v. Templeton, 87 Texas, 45.) The assignment is overruled, as is also for the same reason the sixth assignment, which complains of the refusal of the court to sustain its special exception to the effect that the allegation of the petition that the defective condition of the handhold "was the result of the defendant's negligence and carelessness" was too general in its nature to apprise defendant how or in what respect it is claimed that this condition was the result of its negligence.

While the plaintiff was testifying on the trial in his own behalf he was asked and answered the following questions:

"Q. In what condition is the balance of the hand? A. Back here, well, this wrist is all right."

"Q. Between the wrist joint and the part of the hand that is taken out? A. Well, these bones sticking up there, are sticking right against the skin, and if they touch anything it feels like sticking something in the eye, and I very frequently get them hurt, and it always hurts me, and get cold all the time."

This testimony was objected to on the ground that it was in the nature of future pain and that there was no allegation of that kind in the petition and, the objection being overruled, defendant excepted; thereupon the plaintiff was asked, and answered, the following questions: "Q. Now take up your experience after you left the hospital, you had reached that point? A. Well, of course my hand was tender for months and months, and is tender yet, and it is always cold; the circulation seems to be poor, and in the mornings, and especially in the evenings, I suffer a great deal, because it gets cold, and pains me continually." To this testimony the same objection was urged; whereupon the plaintiff was asked: "You were describing the throbbing sensation that you feel in it now?" To which he answered: "Yes, sir; and at night, if I happen to get on this side and lay on this shoulder, it wakes me up every night that I ever get on it."

Appellant contends that under the allegations of the petition proof of future physical pain was not admissible. The allegations of the petition, that plaintiff's right hand was run over by the wheels of the cars and injured so that the two middle fingers and a portion of the hand had to be amputated and the other fingers greatly injured and deformed; and that in consequence thereof his hand had been practically destroyed and that he had been thereby caused to suffer great mental and physical pain, were sufficient we think to let in the proof objected to, and the assignments raising the points should be

overruled. The allegation "that in consequence of plaintiff's injury, as aforesaid, his hand has been practically destroyed; that he has thereby been caused to suffer great mental and physical pain," it seems to us is equivalent to an allegation, and can only mean that the cause of his physical and mental pain was the injury of which he complains, and is not fairly susceptible of the construction sought to be placed upon it by appellant, that it was an allegation of pain which had been suffered by him prior to the time of filing his petition.

But, treating the allegation as one of past suffering only, ought plaintiff's recovery to be limited to the strict allegations of the petition and a recovery denied for physical and mental pain suffered by him subsequent to the filing of the petition? We think not. Appellant does not contend that future mental and physical pain are not elements of damages for personal injuries, but that to be recovered they must be alleged and proved; that as the petition speaks as of the date of filing suit, unless otherwise shown on its face inquiry into facts transpiring subsequent to that date is precluded; and he refers us, in support of this contention, to the general rule in cases of trespass to try title that the plaintiff to obtain the benefit of a title acquired subsequently to the commencement of his suit, must amend so as to avail himself of it as a new cause of action. The vice in this reasoning becomes at once apparent when it is remembered that in suits for personal injuries the rule is that "In legal contemplation all damages which will be sustained as the effect of the injury are sustained immediately; the future effect of the injury is not special damages which must be alleged, but general damages which necessarily flow from the injuries received." Bradbury v. Benton, 69 Me., 199, quoted in Treadwell v. Whittier, 80 Cal., 581. The rule laid down in Texas & P. Ry. Co. v. Curry, 64 Texas, 87, which seems to have been followed in many other States, is, that the general allegation of damages will suffice to let in proof and to warrant recovery of all such damages as naturally and necessarily result from the wrongful act complained of; the law implies such damages. In the case cited, plaintiff alleged that as the result of his injuries he became sick, and was greatly cut, injured, bruised and wounded internally and externally about his hip and spine, and was wholly unable to attend to the transaction and performance of his usual and necessary business, and has so continued from then until now, and that he had become permanently disabled and a cripple for life, and that he would never recover from the effects thereof. The court charged the jury that in estimating the damages sustained by plaintiff they might take into consideration his mental and physical pain and suffering, and this charge was objected to because these elements of damage were not alleged. Judge Stayton, in discussing the rule of pleading which requires persons seeking relief to inform the adverse party of the facts upon which he intends to rely for a recovery, says: "The rule, however, is satisfied when from the facts stated the law infers other fact or facts, for whatsoever the law infers from a given state of facts, the adverse party is presumed to know and must take notice of whether it is specially pleaded or not. The law infers, when such injuries to the person are shown to have existed as are alleged

and proved in this case, that physical pain resulted therefrom; for by common observation we know that in the ordinary operation of natural laws pain is a necessary result of such injuries, unless the condition of the injured party is abnormal, which will not be presumed. This is equally true as to mental suffering; for it is contrary to common experience and the laws of man's existence and nature that any sane, healthy and robust person by physical injuries may be made a cripple for life in a matter affecting his health, comfort or capacity without mental pain resulting from the changed condition. No proof is required to be made of those things which every person is presumed to know, and as it is not required that proof be made of a fact necessarily resulting from facts proved, then it is not necessary to allege the resulting fact, for it is understood to be averred by the averment of the facts from which it necessarily results."

In Brown v. Sullivan, 71 Texas, 476, Judge Gaines, speaking for the Supreme Court, says: "Where serious bodily injury is inflicted involving fractures, dislocations, etc., and results in protracted disability and confinement to bed, we know that some degree of physical and mental suffering is the necessary result. Hence, when a serious bodily injury, which threatens permanent disability and continues for a long time, is proved, the jury are authorized to consider the pain, both of body and mind, in assessing the amount of damages without direct proof of such suffering." It was held that the court did not err in instructing the jury that plaintiff could recover for his wife's mental suffering, although there was no evidence that she suffered pain of mind.

San Antonio & Aransas Pass Railway Co. v. Weigers, 22 Texas Civ. App., 344, was a suit for damages for personal injuries wherein the plaintiff alleged that he had received certain injuries through the negligence of the defendant, and that as a result thereof his left arm and hand were so badly injured as to be well nigh useless; that the blow across his breast and abdomen had injured him internally; that his heart had been affected, enlarged and misplaced by the blow, and internal injuries inflicted upon his stomach, sides and spine; that he was confined to his bed many weeks and suffered great mental and physical pain and loss of time, and that his injuries were lasting and permanent. The trial court charged the jury that they might take into consideration in estimating the plaintiff's damages "the mental and physical suffering, if any, consequent upon the injury received, . . ." The court at the request of defendant, further charged the jury that plaintiff could not recover for mental and physical suffering after the date of the trial. It was urged by defendant on appeal, as a ground for reversal of the judgment in plaintiff's favor, that the general charge which permitted a recovery for mental and physical suffering after the trial was inconsistent with and contradictory of the special charge. Justice Neal, of the San Antonio Court of Civil Appeals, in rendering the opinion of the court, after saying that the special charge was a qualification of rather than in conflict with the general charge, goes on to say: "But however this may be, we deem it proper to say, . . . that the

special charge limiting the recovery of damages for mental and physical suffering to such as occurred before the trial is erroneous, and should not have been given. Under the general allegations of damages in the petition the plaintiff was entitled to recover for all the injuries which necessarily resulted from the negligence complained of, and it was unnecessary to specify them in the pleadings. Damages for future and permanent effect of injuries which necessarily result to the plaintiff are recoverable under the general *ad damnum* clause, and need not be specifically alleged. (5 Enc. Pl. & Prac., pp. 748, 749; Suth. Dam., secs. 1242, 1244; Texas & P. Ry. v. Goldman, 51 S. W., 275; Village of Ava v. Grenawalt, 73 Ill. App., 633; Treadwell v. Whittier, 80 Cal., 574; 22 Pac., 266; Bradbury v. Benton, 69 Me., 199; Lynch v. Third Ave. Ry. Co. (Super. N. Y.), 13 N. Y. Supp., 236; Rosevelt v. Manhattan Ry. Co. (Super. N. Y.), 13 N. Y. Supp., 598; Denver & R. G. Ry. v. Harris, 122 U. S., 597; 30 L. ed., 1146; Ehrgott v. Mayor, etc., 96 N. Y., 264.)" See also International & G. N. Ry. v. Newburn, 58 S. W., 542; Knittel v. Schmidt, 16 Texas Civ. App., 7; Brown v. Hannibal & St. J. Ry. (Mo.), 12 S. W., 655; Missouri, K. & T. Ry. v. Nesbitt, 43 Texas Civ. App., 630.

We think that under the allegations in this case, which show that the plaintiff was seriously crippled in a matter affecting his future comfort and capacity, the law, even in the absence of an allegation as to mental and physical pain, would infer that he had suffered damages in those respects, and proof would be admissible to show the character, extent and probable duration of such suffering without any specific allegation thereof. As before stated, we do not think the allegations of the petition should be construed as restricting appellee's right to recover to such suffering only as occurred prior to the filing of the suit or the trial of the case.

Our views are not in conflict, we think, with the opinion of the Courts of Civil Appeals in Lodwick Lumber Co. v. Taylor, 39 Texas Civ. App., 302, and City of Rockwall v. Heath, 90 S. W., 514; in both of which recovery was denied for future mental suffering because such damages were not pleaded. In neither of the cases is the character and extent of the injuries stated. In the first case cited it was held that it might be that physical suffering would necessarily result from the injuries alleged and proven, but that in the opinion of the court mental suffering did not necessarily result from such injuries and that to be recoverable they should have been alleged. In Rockwall v. Heath the court held that the submission to the jury of mental suffering as an element of damage, in the absence of an allegation of such suffering on the part of plaintiff's wife, was reversible error. In the absence of any statement in the opinion showing that as the result of her injuries plaintiff's wife was in some way permanently injured in a matter affecting her health, comfort or capacity, we can not dissent from the views there announced. This disposes of appellant's seventh, eighth, ninth, tenth, eleventh and twelfth assignments of error, all of which are overruled.

H. Swanson, a witness for defendant, and who was one of the inspectors who inspected car No. 1061, testified over objection of de-

fendant, that if a lag screw is loose in the wood to a point where the handhold will pull off in the ordinary use of it, "a close inspection of that condition of it would disclose it." Appellant contends that the testimony was a statement of the conclusion of the witness and an invasion of the province of the jury and therefore inadmissible. It was shown that the witness was an expert car inspector, and was then upon the stand as a witness for defendant, and the testimony objected to was given under cross-examination. If it be conceded that the statement was more than one of fact, it will be a sufficient answer to the objection to say that the conclusion was that of an expert shown to have been qualified to give his opinion in regard to the matter about which he was interrogated. Ft. Worth & D. C. Ry. Co. v. Thompson, 75 Texas, 503; International & G. N. Ry. Co. v. Collins, 33 Texas Civ. App., 58. The assignment raising the point is overruled.

Appellant's fourteenth assignment of error complains of the action of the court in overruling its objection to the following question propounded by plaintiff to his witness, McShan: "Tell the court and jury the proper method of inspecting handholds based upon your experience as an inspector." To which the witness replied: "The only way I ever found to inspect handholds to know whether they were securely fastened, was to climb the ladder and shake them." The objection is that the question calls for the conclusion of the witness about a matter that is not the subject of expert testimony, the answer to which would be a summing up by the witness of the whole issue in the case which the jury should determine, and one about which the witness could not express an opinion. The testimony shows that the witness was qualified to testify as an expert, and we think the court did not err in permitting his testimony to go to the jury. (Railway v. Collins and Railway v. Thompson, *supra;* St. Louis, A. & T. Ry. v. Johnston, 78 Texas, 541; McCray v. Galveston, H. & S. A. Ry., 89 Texas, 170; Jones v. Shaw, 16 Texas Civ., 294; Missouri Pac. Ry. v. Jarrard, 65 Texas, 565.)

There is no merit in the seventeenth, eighteenth, nineteenth and twentieth assignments of error. Each complain of the action of the court in refusing to give a special charge requested by appellant. The instructions contained in these charges were sufficiently given in the court's general charge, and it was not necessary to repeat them. The assignments are overruled.

The fifteen assignment complains that the verdict is excessive. Upon this point the testimony shows that plaintiff was 27 years old at the time of the trial; and in regard to his injury he testified as follows: "After I struck the ground I got my hand on the wheel, and may have caught hold of it. I don't know, but the wheel went over my hand. The middle and next to the middle fingers were taken clear out to the knuckle on this hand, and the forefinger was cut, and the little finger was crushed and doubled over, and I had no use of it at all. The two middle fingers were taken out back beyond the knuckles about an inch or one and one-half inches. I suffered a good deal before these fingers were amputated. The two fingers as they first appeared were all covered with blood. This here was hang-

ing with a few leaders in the hand and all mashed. When I got to the infirmary they put me on the table right away and amputated my fingers right away. I was chloroformed, and didn't get over it until 7 o'clock. My hand had remained in the same condition from 2 o'clock to 5 o'clock. The two middle fingers were cut off from an inch to one and one-half inches back into the hand. My thumb is all right, it is limber. My forefinger is practically stiff, what there is left of it, and all the good it is to me is to work my thumb. My forefinger is gone up to the second joint and I am not able to move it very much; in fact, there is practically no movement in it at all, and all the time these fingers seem like they are working. I try to work this, but it don't work. I can not bring my forefinger over to my thumb, but I can bring my thumb over to it. It is stiff and projects out. The little finger is entirely stiff and doubled under from the second joint, and at the first joint it is doubled again. I can not move the little finger, and there is no movement at all in it. It is in a hook shape and very frequently gets caught in things and gets sore for a week or two. It is always in the way. I have no use for any part of my hand that is left except the thumb. I can't grasp a thing in the world with it. It is my right hand that was injured, and I was right-handed. I am not able to use it in writing. I can hold a pencil in there, but not to do any good. I don't make any practice. I use my left hand altogether. The balance of my hand is all right, but those bones stick up, and are sticking right against the skin, and if they touch anything it seems like sticking something in the eye, and I very frequently get them hurt, and it always hurts and gets cold all the time, that is, between the wrist joint and a part of the hand that is taken out. It hurt like everything when it first happened, and I was kinder-like dazed for the time being, and it hurt all the way coming into Houston while I was in the caboose, and then they operated on me. From there I didn't know anything about that, but I woke up about 7 o'clock in the evening, and of course my hand was hurting me like everything, and kept on. I stayed there and the doctor dressed it, Dr. Thomas, and it hurt all the time; then I left there to go to the San Antonio hospital, and the first week it kept hurting like everything, but the doctor said it was getting along all right, and I think just about a week after I got there it commenced jabbing and throbbing and beating, felt like things going up my arm and hitting me in the eyes and in the temple, and the doctor came over and put me in bed, and he got the sisters—it was the sisters' hospital—and told them to put a poultice on that hand every two hours, and they did that, and kept me up at night doing the same thing night and day. Of course, I couldn't at all; this finger, the forefinger, was larger than my wrist, and my hand looked like a large chunk of raw meat, and I suffered a great deal. They kept that poulticing up for upwards of a month, and during that time I couldn't sleep or do anything, and the doctor said I must sleep, and he gave the nurse, I think it was, morphine tablets. I stayed about a month before I got out of the room at all, and then it commenced to heal, and they got all the pus out of it with the poultices, and I stayed there about four months

before it got a place in here where this hole is, and it would not heal in there, there was a lot of pus, and I had to stay there three weeks while they were burning it with some kind of caustic. It was hurting me, but it was easy to what I had gone through with. Then they tried to straighten them, and the doctors just took hold there and them sisters kept rubbing it with olive oil, and I was there four months, and I didn't have a very good time. I mean I was suffering all the time; in fact, there was never a moment I didn't suffer, and the pains were very severe during those four weeks when I was laying up and getting a poultice every two hours. I thought I couldn't stand it at all, because the pain was running up and hitting me between the eyes. After I left the hospital my hand was tender for months and months, and it is tender yet, and it is always cold. The circulation seems to be poor, and in the mornings, and especially in the evenings I suffer a good deal because it gets cold and pains me continually; and if I happen to get on this side and lay on this shoulder that wakes me up every night when I get on it. Since I received the injury I had one job which I got five weeks ago, driving a laundry wagon. I looked all last summer for work, things that I could do. I went to all the coffee houses and stores. I would go over every two or three weeks and see if they needed some one. I got a job driving a laundry wagon for Burkhardt and worked for four weeks, and laid off this week. I never earned anything between the time I got hurt up to the time I got this laundry job. I am driving the fifth ward wagon for Burkhardt and I am making $10 a week. I am not able to brake now, because I couldn't climb a car, couldn't set a brake, and couldn't go over a train. I might do passenger conductor work now, but a man can't get one of those jobs unless he works fifteen or twenty years. In the meantime he has to run a freight, and there is no chance of getting one. I know of no character of work in the transportation department of the railway service that I could perform. I might learn to be a one-handed telegraph operator, but there is not much demand for one-handed anythings the way I have found it, that I have seen in my line. I tried to get work all last summer and don't think I have a lazy bone in my body. I have never been accused of it, not on the road, anyway. I was in good health, and had never been sick, and was 26 years old." The testimony of plaintiff as to the condition of his hand was corroborated by his witness, Dr. Boyd. Under this testimony, and in the light of precedent, we can not say that the verdict was so large as to warrant the conclusion that the jury was actuated by prejudice, passion or other improper motive in making their award. (Brooke v. Clark, 57 Texas, 113; Houston & G. N. Ry. v. Randall, 50 Texas, 261; International & G. N. Ry. Co. v. Stewart, 57 Texas, 170; International & G. N. Ry. Co. v. Brett, 61 Texas, 488.)

Nor do we think the remarks of counsel, complained of in appellant's sixteenth assignment of error, could have improperly influenced the jury in finding the amount they did, in view of the fact that the court twice admonished them not to consider them, and the counsel, who made the remarks complained of, explained to the jury that he did not intend the remarks to be taken seriously and requested the

jury, and requested the court to instruct them, not to consider the remarks.

We are of the opinion that the record is free of reversible errors and that the judgment of the court below should be affirmed, and it is so ordered.

*Affirmed.*

Writ of error refused.