## FREEMAN v. WILSON.†

(Court of Civil Appeals of Texas. San Antonio. April 3, 1912. On Motion for Rehearing, May 15, 1912.)

1. JURY (§ 67*) — SUMMONING — METHOD OF SUMMONING.

The method of summoning jurors prescribed by Rev. St. 1895, art. 3176, providing that notice may be orally delivered by the sheriff to the juror in person, or, in case he cannot be found, then a written memorandum signed by the sheriff officially may be left at the juror's place of residence, should be obeyed, and the sheriff who attempts to summon jurors personally should not merely give them notice by mail.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 291–302, 306; Dec. Dig. § 67.*]

2. JURY (§ 82*) — SUMMONING — IRREGULARITIES—COMPETENCY OF JURORS.

While Rev. St. 1895, art. 3176, provides that notice may be delivered by the sheriff to the juror in person, and, in case he cannot be found, then a written memorandum signed by the sheriff may be left at the juror's place of residence, jurors attending because of notice given in another manner are not subject to challenge, the statute not being mandatory but merely directory, and so where talesmen were given notice by mail, challenges to their competency were properly overruled where it did not appear that the challenging party was in any way prejudiced.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 282, 307–309, 331, 332, 348, 359, 367, 380; Dec. Dig. § 82.*]

3. PLEADING (§ 8*)—FACTS OR CONCLUSIONS—NEGLIGENCE.

In an action by a servant whose eye was destroyed by the splintering of a defective pick, allegations in the petition that the master was negligent in furnishing the plaintiff with the pick which was old, worn, defective, blunt, battered, and insufficient, with a crooked handle which rendered striking uncertain, are not objectionable as conclusions of the pleader.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 12–28½; Dec. Dig. § 8.*]

4. MASTER AND SERVANT (§§ 286, 289, 288*)—INJURIES TO SERVANT — ACTIONS—DIRECTED VERDICT.

In an action by a servant for personal injuries, a verdict should be directed for the master where the uncontroverted evidence failed to establish the master's negligence, or that it was the proximate cause of the injury, or shows that the servant was guilty of contributory negligence or assumed the risk.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050, 1089, 1090, 1092–1132, 1005, 1068–1088; Dec. Dig. §§ 286, 289, 288.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes.

† Writ of error granted by Supreme Court June 26, 1912.

5. TRIAL (§ 178*)—INSTRUCTIONS—REQUEST—ADMISSIONS.

A defendant who requests a charge directing a verdict, and at the same time requests charges presenting issues arising from the evidence, thereby admits the existence of testimony that should be passed on by the jury.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 401–403; Dec. Dig. § 178.*]

6. MASTER AND SERVANT (§ 217*)—INJURIES TO SERVANT—DUTY OF SERVANT TO INSPECT.

A servant is not bound to inspect a pick furnished him by the master to determine whether it is properly tempered.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

7. MASTER AND SERVANT (§ 107*)—INJURIES TO SERVANT—SAFE APPLIANCES.

Where a railroad company furnished its servants with picks with which to remove old ties, and it was impossible for the servants to avoid striking the rails with the picks, it was the duty of the railroad company to furnish properly tempered picks which would not splinter when coming in contact with steel rails.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 199–202, 212, 254, 255; Dec. Dig. § 107.*]

8. MASTER AND SERVANT (§ 217*)—INJURIES TO SERVANT—ASSUMPTION OF RISK.

A servant of a railroad company engaged in removing old ties did not assume the risk of injury resulting from splintering his pick in striking the steel rails, where he had never known of such an occurrence although he had oftentimes seen rails struck.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

9. MASTER AND SERVANT (§ 270*)—INJURIES TO SERVANT—ACTIONS—EVIDENCE.

In an action by a servant against a railroad company for injuries to his eye which was destroyed by the splintering of a pick with which he struck a steel rail, testimony by the servant as to the condition of the pick several days after the accident was admissible; the pick having remained in the custody of the railroad company.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 913–927, 932; Dec. Dig. § 270.*]

10. APPEAL AND ERROR (§ 882*)—PERSON ENTITLED TO ALLEGE ERROR.

A party cannot complain of evidence introduced by himself.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3591–3610; Dec. Dig. § 882.*]

11. MASTER AND SERVANT (§ 264*)—INJURIES TO SERVANT—EVIDENCE—ADMISSIBILITY.

Where the petition in an action by a servant injured by the splintering of a steel pick alleged that the pick was old, defective, and insufficient, and the master alleged that the pick was in good condition, evidence that it was improperly tempered was admissible.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 861–876; Dec. Dig. § 264.*]

12. DAMAGES (§ 34*)—PERSONAL INJURIES—AMOUNT OF DAMAGE.

Under the rule that, when an injury is the result of the combined negligence of the defendant and that of a third person for whose act neither the plaintiff nor the defendant is responsible, the defendant is liable when the injury would not have happened but for his negligence, a master whose negligence caused an injury to one of plaintiff's eyes is liable for injury to the other eye, caused by the unskillful treatment of the physician who attended to the injury.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 43; Dec. Dig. § 34.*]

13. DAMAGES (§ 185*)—EVIDENCE—PERSONAL INJURIES.

In an action by an injured servant, evidence held to show that the servant, knowing that his delay in having his injured eye removed endangered the sight of the other eye, permitted the eye to remain until after the trial.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 503–508; Dec. Dig. § 185.*]

14. APPEAL AND ERROR (§ 1140*)—DETERMINATION—REMITTITUR.

In an action by a servant for a personal injury which had destroyed the sight of one eye, the court charged that the jury might consider the probability of the loss of the other eye which might be affected in case the servant refused to have an operation on the blinded eye. Held that, as the servant was not entitled to damages for the prospective loss of his injured eye, where he refused to have the injured eye removed because it might affect his chances of a verdict, a general verdict based on this instruction must be reversed and cannot be cured by remittitur.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4462–4476; Dec. Dig. § 1140.*]

Appeal from District Court, Bexar County; Edward Dwyer, Judge.

Action by C. W. Wilson against T. J. Freeman as receiver. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

John M. King, of Houston, and Hicks & Hicks, F. C. Davis, F. H. Booth, and J. L. Camp, Jr., all of San Antonio, for appellant. J. D. Childs, of San Antonio, W. C. Campbell, of Palestine, and Jas. W. Brown, of San Antonio, for appellee.

FLY, J. This is a suit by appellee against appellant, as receiver of the International & Great Northern Railroad Company, to recover damages arising from loss of one eye and damage to the other, alleged to have been caused by the negligence of appellant in furnishing him "with a pick which was old, worn, defective, blunt, battered, and insufficient, with a crooked, defective, and insufficient handle which rendered the striking with said pick difficult and uncertain, and defendants were further negligent in then and there failing to provide plaintiff a safe place in which to work because the embankment was steep and washed out at that place, and in failing to provide plaintiff a sufficient number of men to do the said work, which caused plaintiff and compelled him to work as a section hand instead of only requiring him to supervise said work, * * * and the plaintiff was by defendant's said negligence required to work at said dangerous place as aforesaid with said defective tool, and the defendants had therefore negligently permitted the grass to grow along the embankment of said place, which con-

cealed a piece of iron over which plaintiff stumbled at the same time he made his lick with the said pick at one of the cross-ties on said railroad of defendants, and missed the said cross-tie and struck one of the rails which caused the sliver as aforesaid, which would not have occurred had said pick been in proper condition." Negligence was also charged on account of improper surgical treatment by surgeons furnished by the appellant. The court presented only one ground of negligence, and that was the "defective and insufficient condition" of the pick by reason of which condition "a piece of steel slivered off from said pick and struck plaintiff in the left eye." The cause was tried by jury resulting in a verdict and judgment for appellee in the sum of $20,386.05.

The first and second assignments of error complain of the action of the trial judge in overruling appellant's "motion to have the sheriff summon the regular jurors drawn from the wheel for June 12, 1911, the day on which the case was set for trial, and in refusing to dismiss the talesmen summoned by the sheriff," and in compelling appellant to go to trial before a jury not summoned as the law requires, also in overruling a motion to have the sheriff summon the regular jurors drawn from the wheel. The only proposition is, "The law requires that the jurors shall be selected from the jury wheel and provided the manner in which they shall be drawn, and the manner in which they shall be summoned by the sheriff, and the court erred in requiring the defendant to try his case before a jury not drawn, selected, or summoned in the manner prescribed by law."

[1] It appears from the bill of exceptions that only two of the jurors for the week were personally served by the sheriff; the method of serving adopted being to mail post cards to each of the jurors. The reason given for thus summoning jurors was that it would be impossible to get service in any other way. The regular panel of 50 men for the week, when this cause was tried, had been drawn from the wheel as prescribed in the law of 1907 in regard to jurors in all counties having a city or cities therein containing a population aggregating 20,000 or more people. The mode of summoning the jurors is prescribed in article 3176, Revised Statutes, which states: "Such notice may be orally delivered by the sheriff to the juror in person, or, in case such juror cannot be found, then a written memorandum thereof, signed by the sheriff officially, may be left at the juror's place of residence, with some member of his family over sixteen years of age." Evidently the law enjoins personal notice by the sheriff or his deputies to the juror, and the only exception to that requirement is in case the juror cannot be found, in which event a written notice must be left by the sheriff at the place of resi-

dence with a certain designated person. Nowhere in the law is there any provision for summoning jurors through the mail, but it was contemplated that the sheriff should seek for the juror, and, when found, orally notify him that his presence was required at a certain time and place for a certain duty, and, in case of failure to find him, to go to his place of residence and leave a notice, as specifically required by law. It may entail an immense amount of labor upon sheriffs to comply with the plain requirements of law, but with that the courts have no concern, for it is a matter to be addressed to the legislative branch alone of the government. It may be that it is impossible of performance without great trouble and expense, but the law of Texas commands it and it should be obeyed.

[2] While the law is explicit as to the manner of summoning jurors and provides the only legal method in which it should be done, and while the business of the court may be retarded and hampered by its inability to enforce the attendance of jurors summoned in any other than the statutory manner, still it is not provided in the law that a jury summoned in any other manner shall not be allowed to serve, and neither has the failure to summon a venire or a juror according to law been made a cause for challenge either to the array or to the individual. The object in summoning jurors is to obtain their attendance, and the reason for providing a method for summoning them is to lay a basis for the enforcement of such attendance, and, while appellant has attacked the post card method of summoning jurors, it is not contended that a juror who obeys such summons is not legally qualified to serve, nor that he is subject to challenge, but the ground of objection is that the post cards did not bring the jurors to court, and that the court should not have ordered talesmen to be summoned, but should have delayed the trial until the sheriff could have summoned the absent regular jurors.

Appellant did not challenge the talesmen on any statutory grounds, did not claim that the officer who summoned them acted corruptly or willfully summoned jurors known to be prejudiced against appellant or biased in favor of appellee, but merely claimed that it had the abstract right to have the panel filled by jurors drawn, selected, or summoned in the manner provided by law. No objection was urged to the nine jurors present who had been drawn, but not summoned, as the law directs, but the motion was directed at the talesmen. There being no provision in the law that jurors summoned in any other manner than that prescribed shall not be permitted to serve, and such failure to so summon the jury not being made a cause for challenge, we are of opinion that the manner of service of notice is not mandatory, but directory, and the failure cannot be-

made the subject of complaint unless it appears that the party complaining has been injured by it. Sutherland, Stat. Cons. §§ 444 and 449. As said by this court in Railway v. Worth, 116 S. W. 365: "It is not claimed that appellant suffered any injury by the manner in which the jury was chosen. Appellant is contending for a mere abstraction which, unfortunately for it, is not made a ground of challenge to the array." Not only was no objection urged to the individual fitness of the jurors, but the judge attaches to the bill of exceptions his certificate that "the sheriff's office did not use any unfair means, either in summoning the said venire or the said talesmen, and that he used due diligence in summoning the venire, as well as the talesmen, and many of said jurors, who have been summoned, are personally known to the court to be good, true, and reliable citizens of Bexar county, Tex., and duly qualified to do jury service and render an impartial verdict in any cause, and in fact the court does not know of a single instance of a corrupt juror being summoned, and there being no charge or evidence of bias or prejudice or corrupt practice being used in summoning any of the said jurors, or upon the part of the jurors, the court is of the opinion and finds that, the said jurors being duly qualified, the motion of defendant to quash the venire and dismiss the talesmen from the jury service in this cause should have been and is overruled." The matter rested largely in the discretion of the judge as to whether he would delay the trial of the cause until the regularly drawn jurors could be summoned as the law directs, and it is not apparent that appellant was prejudiced by his action in the matter. There might arise a case where a party would suffer from a failure to obtain the presence of the jurors whose names were drawn from the wheel, but appellant fails to make out a case. It is pertinent to say that article 3176 was enacted to be obeyed by the officers of counties, and, while the custom has prevailed in some of the large counties of ignoring the provisions of the law, it should not meet with the commendation of the courts.

[3] The third assignment of error assails the action of the trial court in overruling a special exception which attacked that part of the petition which alleged that appellant was negligent "in furnishing plaintiff with a pick which was old, worn, defective, blunt, battered, and insufficient, with a crooked, defective, and insufficient handle which rendered the striking with said pick difficult and uncertain." The grounds of exception are that the allegations are mere conclusions of the pleader, and fail "to show wherein, or how, or in what manner, defendant was negligent." The allegations were sufficient, though they might easily have been more explicit. Railway v. Brinker, 68 Tex. 500,

3 S. W. 99; Railway v. Hennessey, 75 Tex. 155, 12 S. W. 608; Railway v. Abbey, 29 Tex. Civ. App. 211, 68 S. W. 293; Railway v. Hayden, 29 Tex. Civ. App. 280, 68 S. W. 530; Southern Pac. Co. v. Godfrey, 48 Tex. Civ. App. 616, 107 S. W. 1135; Railway v. Beauchamp, 54 Tex. Civ. App. 123, 116 S. W. 1163.

[4] The fourth and fifth assignments complain of a refusal of the court to grant a motion to instruct a verdict for appellant, the motion having been made immediately after appellee had rested in the introduction of his testimony. The propositions are that when the plaintiff's evidence fails to establish negligence, or that the negligence was the proximate cause of the injury, or when the evidence of plaintiff shows contributory negligence or assumed risk, a verdict for the defendant should be instructed. The propositions are axiomatic, if either of the points named was established by uncontradicted evidence offered by appellant. If appellee made out a case at all, he made it out when the motion to instruct was presented, for appellant introduced but little testimony tending to controvert the testimony of appellee as to the circumstances under which he was injured or the condition of the pick used by him. The additional testimony offered by appellee after the motion to instruct had been overruled merely intensified and corroborated testimony that had been theretofore introduced.

[5] Appellant, after all the testimony had been submitted, asked the court to give a charge instructing a verdict for appellant, but in connection with it asked charges presenting different issues arising from the evidence, thereby admitting the existence of testimony that should be passed upon by a jury. Whether this act should preclude the consideration of any assignment questioning the proofs as to negligence, contributory negligence or assumed risk or not, we have given thorough consideration to the facts and have reached the conclusion that there was sufficient evidence to justify a presentation of the case to the jury.

But one ground of negligence was presented to the jury, and that was as to whether appellee had been furnished by appellant with a pick which was "in a defective and insufficient condition," and was thereby guilty of negligence which was the proximate cause of appellee's injuries. As to that issue, appellee testified: "On December 6, 1909, I was engaged at work on the International & Great Northern Railroad, one and a half miles north of Overton. I was replacing ties, taking out old ties and replacing them with new ties. * * * We first cut the dirt from around the old ties with our shovels, then we set the jacks in the track and jacked the track up a little bit, enough for the old ties to slip out, then we removed the old ties with picks and re-

placed the new ones also with picks, then, of course, we spiked up the new ones, surfaced it up and dressed them up, and it is completed. The work I was engaged in was the work I was required to do by the company, that was in the line of my duty; I was required to do that work. * * * Well, as I have said, I was removing the old ties and replacing new ones, and, on removing the old ties, the pick I was using removing the old ties struck the rail and knocked a sprawl of steel off the pick and struck me in the left eye—a small piece of substance, I said a sprawl, it might be called a splinter, it was a small piece of steel. I was sticking the pick in the tie to remove it, and this is usually the custom in removing old ties; I stuck the pick in the center of the tie, I mean something like midway between the two rails, over in the center of the track. When I set it in there, I drew the tie through as far as it would come for the rail, and then I stepped back, and then I stepped back and made a lick, struck the pick against the rail to get a nip against the rail to draw it out of the track and make a pry against the rail, * * * and I was aiming to make a lick right against the rail so I could draw it out of the track, and the pick struck the rail and knocked a sliver or piece and struck me in the left eye. * * * Each point of the pick was worn and sort of battered from use. The point I struck with was worn dull. * * * When I made my lick I struck the rail, missed the tie, and hit the rail; I hit the rail right over the tie. When I hit, it flew a piece of steel off of the pick and struck me in the eye and resulted in loss of the eye. I examined the pick afterwards when I came back from the hospital, about third or fourth evening after I got hurt. * * * I went to look for this pick. I went down to the car house after I came back, the house we keep our tools in. I found the pick at the tool house. * * * I examined it and found a sliver off of the pick, off of the point of the pick I was using when I got hurt." He testified that the pick was harder than the rail, and where the pick struck the rail there was an impression, but there was nothing gone from it. He stated that he knew the condition of the pick, but did not know it was dangerous, and did not know that it was not properly tempered. He further testified: "In throwing a pick that way, I expect I have hit the rails on top there a thousand times, maybe more than that, the top of it, and side of it; I have hit it in all kind of ways."

Appellee was asked by appellant if the picks were made to strike the top of a ball of iron, and he replied: "Made to strike anywhere you want to use them. Sometimes you absolutely have to do it in street crossings and road crossings, you can't avoid it, especially in streets. That pick was made to dig in the ground with, it is just like I answered, it is made to dig in the ground, and to dig in ties, and to dig in a number of places. Digging in the ground is one of the objects; sticking in cross-ties, that is another object. I don't mean to say that it is ever used for the purpose of striking on iron with; I have not said that, but it is often the case you can't keep from striking the rail. I don't know whether you would call it an accident or not when you happen to strike that pick on top of a ball of iron with the force of that three feet leverage you get in bringing that over. It would be unavoidable to me; you can't keep from striking it; but if the pick had been properly tempered it would not have sprawled off."

The evidence tended to show that the pick was made with two points, one to be used in digging in the earth, and the other for digging into wooden ties; the last being pointed for that purpose. It is evident that neither point was intended to be used in striking the ball or top of the steel rails, and appellee did not intend to so use it at the time that he struck the top of the rail and caused the piece to fly off and enter his eye. It is clear that, if the pick had landed where he intended that it should land, he would not have been injured. There is no evidence tending to show that appellee struck the rail by reason of any defect in the pick. The handle did not cause the blow to fall on the steel rather than on the wood, for appellee testified: "I would not consider a pick dangerous, otherwise in a good condition, with a handle in that fix." In other words, the condition of the pick had no connection with the blow falling on top of the rail, and appellee must recover, if at all, on the ground alone that it was the duty of the master to furnish him, under the circumstances, with a pick that would withstand a steel rail should it come in contact with it, as was unavoidable at times in the prosecution of the master's work. The evidence clearly showed that, if the pick had been tempered as it should have been, it would have been harder than the rail, and that when struck with great force against a rail no sliver or splinter would have been torn from it. It was shown that the rails on the International & Great Northern Railroad are made of soft steel and are much softer than the material in picks, and that, if a pick was properly tempered, a blow on a rail would not break or splinter it, but it would go into the soft steel of the rail.

[6] The evidence was uncontroverted that it was often impossible in furtherance of the work of the railroad company to keep from striking the rails, and this fact must have been known by appellant, and reasonable care should have been exercised in furnishing instrumentalities that would meet the exigencies of the work. It cannot be said

149 S.W.—27

that appellee chose the pick, for there was only one, the others being in the hands of the other employés, and he could not be held to know whether the pick was properly tempered or not. That was a matter which called for an inspection, which appellee was not called upon to give it, and a knowledge of which could not have been ascertained had appellee used all the means at hand to ascertain the condition of the pick. Drake v. Railway, 99 Tex. 240, 89 S. W. 407. That the pick was imperfect and not suited for the use to which it was put appears, not only from the evidence of witnesses, but from the fact that, although appellant had the pick in its possession, it failed to produce it.

[7] The rule is well established that the master's duty in respect to his instrumentalities is restricted to seeing that they are reasonably safe for the performance of the functions for which they are designed, and if the instrumentality is used for some purpose not intended and fails to answer such purpose, and an injury is inflicted by such use, the master would not be liable.

It is clear that the pick in question was manufactured for use in digging in the ground and wood. Appellee stated that it was not intended to be used in striking iron or steel. Appellee testified: "I don't mean to say that it is ever used for the purpose of striking on iron with; I have not said that, but it is often the case you can't keep from striking the rail." If that statement be true, and it is not controverted, would a pick, which with the utmost care and caution would at times come in contact with the rail, be a safe instrumentality for such work, if not so tempered as to withstand a blow upon the rail? This is the crucial question in this case, and no authority bearing upon it has been produced by either party to this suit.

The evidence does not indicate that it is absolutely. necessary in the prosecution of the work of removing rails from the roadbed to strike the rails, but the evidence is that it is unavoidable at times. The striking of the rails being unavoidable, it was so incidental to and connected with the work that the burden was placed upon appellant to furnish a tool that would withstand such incidental blows. It cannot be doubted that if appellee had been employed to dig in soil in which rocks were imbedded, and consequently at times they would be struck, a tool that would not withstand blows upon such rocks would not be one reasonably suited for such work. So, if with care blows upon the rails were unavoidable, a tool should have been furnished which was so tempered as not to splinter or throw off particles when struck upon a rail.

[8] This proposition is not assailed by appellant; the only contentions being that there was no pleading under which the question of the temper of the tool could be rais-

ed, that appellee had assumed the risk of the splinter flying off, and the accident was unavoidable. We think the hitting of the rail was, as conceded by appellant, unavoidable, but the flying off of the splinter was not, and appellee could not have assumed the risk of the splinter flying because he had never known, in the 14 years he had worked for appellant, of such a thing occurring, although he had seen the rails struck with picks many times. Railway v. Trijerina, 51 Tex. Civ. App. 100, 111 S. W. 239.

[9] It was not error to permit appellee to testify that he had examined the pick three days after the accident and found a sliver gone from it. The pick had been in the possession of appellant from the day of the accident, and, if it were not in the same condition that it was immediately after the accident, it alone could have shown that fact. It made no effort to do so, and the pick was not produced in court. Railway v. Johnson, 83 Tex. 628, 19 S. W. 151.

[10] Appellant cannot complain of the testimony introduced to show the relative hardness of the pick and rail because it introduced a portion of a deposition of appellee, as follows: "I think the sliver was from the pick because the pick was very dull and blunt, and it was natural, it being the harder metal, that it would sliver in preference to the rail."

[11] Appellant in its answer alleged that the pick was in good condition, and appellee was authorized to introduce any testimony tending to show that it was not in good condition, even if he did not have the right to show the temper of the pick under the allegations of the petition. However, we think under the allegations appellee was authorized to prove that the pick was not properly tempered. It was alleged that it was "old, worn, defective, blunt, battered, and insufficient," and it was shown by the evidence to be old, worn, blunt, and battered, and it was proper to allow testimony to show that it was defective and insufficient, as proof of an improper tempering tended to show.

The witness Barry qualified as an expert, and his testimony was properly permitted. No hypothetical facts were assumed in the questions that had not been proved, nor were the questions leading.

[12] The court charged the jury, in effect, that if they found that appellant was guilty of negligence in furnishing a defective and insufficient pick, for the purposes for which it was being used, and that when appellee struck a steel rail a sliver flew off and struck him in the left eye, "thereby injuring the said eye and destroying the sight thereof, and which resulted in injuring the sight of the right eye as alleged by plaintiff," etc., they should find for plaintiff. There was no allegation in the petition that the sight of the right eye was directly affected by the splinter, but, after fully alleging the negli-

gence of the physicians employed by appellant in the treatment of the injured eye, it was alleged: "And the said defendants and their said agents then and there further failed to caution and warn the plaintiff to have the said piece of metallic substance taken out or it would endanger the sight of said eye as well as the other eye." It is the rule that when an injury is the result of the combined negligence of the defendant and the negligent or wrongful act of a third person, for whose act neither the plaintiff nor the defendant is responsible, the defendant is liable, when the injury would not have happened except for his negligence. Cooley, Torts (3d Ed.) pp. 121 and 122. While the failure to perform certain acts may have been a remote cause of the injury to the right eye, still, if the first cause had not arisen, the injury to neither eye would have occurred, and appellant has no cause of complaint because the acts of its physicians were not submitted to the jury. Appellant did not charge appellee with a lack of care in the treatment of his eyes, and, it appearing that the causal connection between the original negligence and the consequent injuries was unbroken, there was no affirmative error in the charge. It is the rule that if the plaintiff has received an injury for which the defendant is liable, and the plaintiff exercises reasonable care in selecting a physician to treat the wound, but the injury is aggravated by the unskillful treatment of the physician, the plaintiff may recover the enhanced damages produced by such treatment, as they are deemed to follow proximately from the wrong of the defendant. 2 Thompson on Neg. 1091; Railway v. Hollis, 2 Willson, Civ. Cas. Ct. App. § 218; Railway v. Doyle, 25 S. W. 461. The eighteenth to the twenty-fifth assignments are overruled.

[13] The only evidence that tends to show that appellee may possibly lose his right eye is that of Dr. Beck, and he bases his opinion as to a possibility of loss of the eye on the hypothesis that neither the piece of steel nor the left eye would be removed. Dr. Beck testified: "With the history of the case before me, supposing the conditions remained as they are now, no operation performed or anything of that sort, the probable result to the other eye, the one that he now sees out of, in my opinion it would be extremely dangerous and likely that he would lose the sight of it. If this condition remains and operation is performed—this other eye is allowed to remain as it is—I think he will lose it." That is, if appellee, with full knowledge that he can save his eye by having the piece of steel removed, or the blind eye removed, makes no effort to have either of those things done to protect his right eye, he may become blind in that eye. In order to find damages for the loss of the right eye, the jury had to assume that appellee would not have the necessary operation performed to protect his right eye, and appellee could remain inactive until a judgment based on total blindness was affirmed and then have the operation performed by which his right eye would be saved. He went to no doctor after he left the hospital; his reason being that he "was not able right then." He admitted that he voluntarily left the hospital where the railroad physicians were treating him, and stated that his wife was pregnant and he had to leave. He testified: "I didn't think it was discreditable at all to bring my wife into it and tell them that she pregnant. I preferred to misrepresent as to my wife than to tell the doctor he was cruel to me; he might have kicked me out of the hospital. He was likely to pass me and give me a tongue lashing; I hardly think he would kick me out."

Dr. Gohlman, who dressed appellee's eye, stated: "The next morning I got a telephone message from the house surgeon. I arrived at the hospital at 8 o'clock and went into the dressing room where they dressed the wounds, and Mr. Wilson was in the dressing room there preparing to leave; he said he couldn't stay any longer because his wife was about to give birth to a child, and he would have to go home, and that he thought he ought to be there under those circumstances. I told him that, although I thought a man should be home under those circumstances in ordinary cases, his eye was in such condition that he ought to stay there, and argued with him for fully half an hour, and the house surgeon was there too and argued with him how serious it would be should he leave the hospital, and over our protest he left." Appellee does not specifically deny that such conversation between him and Dr. Gohlman took place. Appellee admitted that he had told a certain person that he was not going to have his eye taken out until after his suit was ended. "I told him my counsel advised me not to have my eye taken out because they might claim I had a good eye taken out." That admission seems to explain the delay in having the eye treated.

The evidence clearly shows that appellee fully appreciated the danger to his right eye of permitting his left eye to remain as it was, because he consulted different physicians as to their charge for taking the eye out. This was more than a year before the trial, and yet he delayed the operation and took the chances on losing his other eye, because to use means to retain its sight might have influence on the result of the suit which he had filed or intended to file.

[14] The verdict in this case is for $20,-386.05, and can be justified only on the ground that appellee will eventually be totally blind. The only evidence sustaining that hypothesis is based on the ground that appellee will not put forth any efforts to save his other eye, which all the evidence tends to show can be done by an operation. Appellee

did not swear that he was unable to have that done at the time of the trial, and, while Dr. Gohlman may have indicated what he would charge for an operation, there was no testimony tending to show that the appellant was not willing to perform the operation without cost. He voluntarily left the hospital where he was being treated by physicians furnished by appellant, setting up his judgment against that of the doctors, using the subterfuge of his wife being in a delicate condition in order to get out of the hospital.

There being no way in which the damages allowed for the loss of the left eye can be separated from those given on the hypothesis that appellee will not have the steel removed from the left eye, or the eye removed, no remittitur can be suggested that would cure the excess in the verdict, and a reversal of the judgment becomes necessary.

The judgment is reversed and the cause remanded.

### On Motion for Rehearing.

The evidence indicates, we think, clearly that appellee was fully apprised of the danger of permitting the wounded eye to remain as it was and the probable effect on the other eye. He consulted several eye specialists, had his eye examined with the X-ray, and consulted Dr. Beck as to the course he should pursue. He testified: "I went to Dr. Beck for his advice in regard to my eye, what he thought about it, whether he thought it was going to have to be removed or not." Dr. Beck testified that, if the injured eye was not removed, the other eye would probably be lost. Shall we presume that when he was consulted about removing the eye that he did not tell appellee what would probably result if he did not remove it? If appellee had received information from the doctor to the effect that there was no danger in not performing the operation, can it be imagined that he would not have told the jury? It is inconceivable that of all the eye specialists consulted by appellee not one was honest enough to tell appellee that an operation was absolutely necessary in order to protect the uninjured eye. That he had received such information, but delayed an operation until after a trial of his case, is shown by what he told the man in Louisiana. He took the chances on losing his right eye, because an operation with its results might affect the trial of his cause.

It is stated in the motion for rehearing that appellant produced no doctor who was able to swear that an operation would save the right eye, but such testimony was unnecessary, because Dr. Beck, appellant's witness, in effect swore to that when he said that there was a probability that appellee would lose his right eye if an operation was not performed. That statement carried with it the inseparable conclusion that the probability of loss of the right eye would be removed by an operation.

This court does not hold that a verdict for $20,000 would be excessive for the total loss of sight, and no such case is presented by the record, but a verdict for that sum has been predicated on evidence that there may be total blindness if appellee persists in not having the left eye, which was injured, removed. The verdict is predicated in part, at least, upon a presumption that appellee will not do for himself what reason and common sense demand that he should do. How much of the verdict was given on the probability of total blindness no one knows, and there is no way to ascertain it. It follows that a remittitur cannot be suggested by this court.

The motion for rehearing is overruled.